1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,                    CASE NO. 11-cr-3518 – IEG

12                                Plaintiff,     ORDER GRANTING IN PART AND
                vs.                              DENYING IN PART
13                                               GOVERNMENT'S MOTION IN
                                                 LIMINE TO ADMIT STATEMENTS
14  DANIEL ARTHUR CLEVENGER,                     ABOUT SMUGGLING
                                                 ARRANGEMENTS [Doc. No. 35].
15                                Defendant.

16

17          On November 14, 2011, the Court heard oral argument on the parties' motions in limine.

18  At that time, the Court indicated that it would issue a written order regarding Government's

19  motion to admit statements about smuggling arrangements.  [*See* Doc. No. 35.]  Having considered

20  the parties' arguments and their supplemental briefing, and for the reasons set forth below, the

21  Court **GRANTS IN PART and DENIES IN PART** the Government's motion.

22                                **BACKGROUND**

23  **I.      Factual background**

24          On July 25, 2011, at approximately 3:10 p.m., off-duty Supervisory Border Patrol Agent

25  Kenneth Farish, Sr. was driving behind a red Ford Explorer when he observed it come to an abrupt

26  halt in the middle of State Route 94 in Potrero, California, before pulling over to the shoulder of

27  the road.  While the Explorer was on the side of the road, Farish heard its horn honk and then

28  observed three men run from the brush on the roadside and enter the Explorer.

1    Suspecting the Explorer had picked up undocumented aliens, Farish notified the Campo

2    Border Patrol Station to report the incident.  Shortly thereafter, a call went out to patrol agents

3    notifying them of a red Explorer possibly transporting undocumented aliens.  Two Border Patrol

4    Agents, Jeff Seldon and Christopher Gallegos, received this call, came into contact with the red

5    Explorer driven by Clevenger, and initiated a traffic stop just before the Explorer entered the cone

6    pattern for the Border Patrol Checkpoint on Route 94.  A third agent, Supervisory Agent Leo

7    Robinson, joined Seldon and Gallegos and assisted with the traffic stop.

8    Clevenger, a United States citizen, and his three passengers—Diego Andres Cardenas-A

9    La Torre, Jose Luis Hernandez-Victoriano, and Victor Manuel Raya-Vaca, all of whom admitted

10    to being Mexican citizens without legal permission to enter or remain in the United States—were

11    arrested and brought to the Brown Field Station.  The arrest occurred at approximately 3:45 p.m.

12    At the station, a record check revealed a criminal history for Clevenger.  A record check

13    also revealed a history for Raya-Vaca, indicating that he had been previously apprehended

14    illegally entering the United States and was identified as a "foot guide" on at least three prior

15    occasions.

16    At approximately 12:30 a.m. the following day, Clevenger was *Mirandized* and provided a

17    recorded sworn statement.  According to Clevenger, he saw the three men on the side of the road,

18    thought they were hitchhiking, and stopped to give them a ride.  The man who talked to him spoke

19    perfect English.  No arrangements were made to pay Clevenger for the ride.

20    Agents interviewed the three other men arrested with Clevenger.  Hernandez and Cardenas

21    gave somewhat inconsistent statements, which are discussed in more detail below.  Neither could

22    identify any of the individuals with whom they spoke in a photo lineup.  Raya-Vaca asserted his

23    Fifth Amendment rights and did not give a statement.  He was promptly removed to Mexico.

24    **II.    Material witnesses' statements and depositions**

25        A.    Jose Luis Hernandez-Victoriano

26    Shortly after his arrest on July 25, 2011, at approximately 6:29 p.m., Hernandez provided a

27    video-recorded statement at the Brown Field Station.  He admitted that he is a Mexican citizen and

28    that he did not possess immigration documents allowing him to be in the United States.

Hernandez stated he went to Tecate, Mexico, on July 24, 2011, and a foot guide offered to take him to Los Angeles for $5,000.  Hernandez jumped the fence east of the Tecate Port of Entry to enter the United States and walked through the mountains for approximately ten hours.  The foot guide left to make a telephone call and never returned.  Hernandez told the rest of the group they should try to wave down a vehicle and hitch a ride.  Shortly thereafter, he waived down a red vehicle and told the driver as best he could in English that he had a sick mother.  The driver apparently felt sympathetic and decided to give Hernandez and the rest of the group a ride.

Hernandez's statement concluded at 7:00 p.m., and he was returned to his holding cell.  Shortly thereafter, he began knocking on the door to get someone's attention.  When an agent opened the door, Hernandez allegedly stated he wanted to provide the truth and additional evidence about the smuggling event.

Hernandez was re-interviewed at 7:29 p.m.  He stated that his previous story was true, except for how they came into contact with the red vehicle.  While walking, Hernandez noticed the foot guide speaking casually to another person in the group—"El Guero," a slender man with a light skin tone and green eyes.  The two discussed the route the group would take to get picked up.  Hernandez believed El Guero made a telephone call once the group was at a safe location.  El Guero left for an hour and went to a high point.  He came back running quickly, and Hernandez saw a red vehicle approaching.  The vehicle came to a sudden halt, and El Guero approached and spoke to the driver in English.  El Guero whistled, signaling the rest of the group to get into the vehicle.  El Guero also jumped into the vehicle with them.

Hernandez was unable to identify El Guero or the driver of the red vehicle from photo lineups.  The sworn statement concluded at 7:42 p.m.

Hernandez provided a videotaped deposition on October 6, 2011.  He again admitted that he is a Mexican citizen and was in the United States illegally.  He admitted that he made arrangements to be smuggled into the United States while in Tijuana, Mexico, then took the bus to Tecate, and then made contact with one of the smugglers at a bus station in Tecate.  He was then taken to a house where he and the other smuggled alien in this case, Diego Andres Cardenas, spent the night.  The following morning they were taken by the smugglers to the border fence by car and

jumped over the fence, along with another individual who guided them.  Hernandez testified that they were led by the smugglers to State Route 94 near mile marker 42 and were told that a person in a red Explorer would pick them up.  When the Explorer arrived, they ran out from their hiding spot on the hillside above the highway and jumped inside the vehicle.  Hernandez testified that after Border Patrol spotted them, Defendant Clevenger, who was the driver of the vehicle, threw his cell phone out of the driver's side window of the vehicle.  According to Hernandez, Clevenger proceeded to drive to the Border Patrol checkpoint where they were detained.

### B.  Diego Andres Cardenas-A La Torre

Cardenas provided a videotaped sworn statement at approximately 8:38 p.m. on July 25, 2011.  Like Hernandez, Cardenas stated he is a Mexican citizen, had no documents giving him legal permission to enter or remain in the United States, and had entered the United States by jumping the fence east of the Tecate Port of Entry with two other people.

Cardenas stated he made arrangements in Tecate, Mexico, with "Felix" to be smuggled into the United States for $4,500.  Felix was to guide him via Nextel radio to a location where he would be picked up by a red Ford Explorer.  Felix drew a map of the approximate locations where Cardenas would cross and where he would be picked up—Route 94 by mile marker 42.

Cardenas believed Felix was watching the group during the trip from a high point. Cardenas insisted no foot guide crossed with him; rather, Felix had guided the group by radio. Cardenas contacted Felix by radio when he arrived at mile marker 42.  Soon after, a red Ford Explorer drove up at a high rate of speed before stopping abruptly.  Cardenas and two other people ran to and entered the Explorer.  Cardenas saw a Ford Ranger behind the Explorer, and he saw that the Ranger's driver wore a Border Patrol uniform and had observed the group entering the Explorer.  Cardenas said that once the Border Patrol began following the Explorer, the driver of the Explorer began to drive very fast.  Cardenas could not identify any individuals in a photo lineup.  The interview concluded at 9:12 p.m.

In his videotaped deposition on October 6, 2011, Cardenas admitted that he is a Mexican citizen who cannot lawfully enter the United States.  He admitted that he made arrangements to be smuggled into the United States while in Tijuana, Mexico.  He then provided an account of the

1    smuggling, which mirrored that given by Hernandez in his videotaped deposition.

2        C.    Victor Manuel Raya-Vaca

3        The third passenger, Victor Manuel Raya-Vaca, invoked his rights and declined to answer

4    questions without an attorney present.  Raya-Vaca had been arrested as the suspected foot guide.

5    Charges were not filed against him, however, and he has since been removed to Mexico.

6    **III.    Procedural background**

7        Clevenger previously filed motions to dismiss indictment for violations of Federal Rule of

8    Criminal Procedure 5 and the Due Process Clause of the Fifth Amendment.  The Court denied

9    those motions by written order on October 13, 2011.  [*See* Doc. No. 33.]  Clevenger also sought to

10   dismiss the indictment due to the Government's deportation of an exculpatory witness, Raya-Vaca.

11   The Court denied that motion on September 28, 2011.  [*See* Doc. No. 27.]  Finally, Clevenger also

12   sought to suppress his statements on several grounds.  The Court denied those motions by written

13   order on October 18, 2011.  [*See* Doc. No. 34.]

14                          **DISCUSSION**

15       The Government asks the Court to admit the discussions between the material witnesses

16   and the smugglers during the course of the smuggling venture and statements made regarding the

17   details of the smuggling arrangements.  It argues the statements made by the smugglers are

18   admissible because they were made by co-conspirators while the conspiracy to smuggle the aliens

19   into the United States and to transport the aliens within the United States was ongoing.  Clevenger

20   opposes this motion on the ground that the Government failed to show that Clevenger was part of

21   the conspiracy to *smuggle* the aliens into the United States, as opposed to the conspiracy to

22   *transport* them once in the United States.  Clevenger also asserts that the Government cannot rely

23   solely on the statements of the co-conspirators to establish that a conspiracy exists.

24       Pursuant to Federal Rule of Evidence 801(d)(2)(E), statements made by a co-conspirator of

25   a party during the course and in the furtherance of a conspiracy are deemed non-hearsay.[1]

26   For the statements to be admissible as co-conspirator statements, the Government bears the burden

27   _____

28       [1] The statements are also not deemed testimonial, and therefore their admission does not violate the Confrontation Clause.  *See Crawford v. Washington*, 541 U.S. 36, 56 (2004); *Bourjaily v. United States*, 483 U.S. 171, 181-82 (1987).

1    of demonstrating by a preponderance of the evidence that: (1) a conspiracy existed; (2) the

2    defendant and the declarant were members of the conspiracy; and (3) the statements were made

3    during the course of, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S.

4    171, 175 (1987).  The contents of the co-conspirator statements are not alone sufficient to establish

5    the existence of a conspiracy or the participation therein of the party against whom the statements

6    are offered.  Fed. R. Evid. 801(d)(2); *see also United States v. Silverman*, 861 F.2d 571, 577-78

7    (9th Cir. 1988) ("[W]hen the proponent of the co-conspirator's statement offers *no* additional

8    proof of defendant's knowledge of and participation in the conspiracy, the statement must be

9    excluded from evidence."); *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988) (for the

10   co-conspirator statements to be admissible, "there must be some evidence, aside from the proffered

11   statements, of the existence of the conspiracy and the defendant's involvement").

12   **I.      Existence of conspiracy**

13          The Government has shown by a preponderance of the evidence that two conspiracies

14   existed in this case: (1) to smuggle the aliens into the United States and (2) to transport them

15   within the United States.  The existence of these conspiracies is established by the discussions

16   between the material witnesses and the smugglers *and corroborated by* the fact that: (1) both

17   material witnesses admitted to being in the United States illegally; (2) both of them indicated that

18   they paid monies to be smuggled into the United States; (3) both of them did cross the border and

19   were picked up in the United States; and (4) after jumping the fence, both of them proceeded to be

20   transported by car within the United States.  *See Bourjaily*, 483 U.S. at 180-81 (co-conspirator's

21   statements sufficiently corroborated by defendant's actions of showing up at the pre-arranged spot

22   at the pre-arranged time, picking up the cocaine, and having a significant sum of money on him).

23          The Court, however, rejects the Government's argument that what is involved here is one

24   big conspiracy "to smuggle and transport" the aliens, rather than two separate conspiracies.  The

25   Government's argument is belied by the indictment in this case, which specifically charges

26   Clevenger with separate substantive counts of: (1) *bringing* Hernandez and Cardenas into the

27   United States (counts 2 and 4), and (2) *transporting* them within the United States (counts 3 and

28   5).  Similarly, the statute pursuant to which Clevenger is charged, 8 U.S.C. § 1324, specifically

1   delineates separate immigration offenses.  As the Ninth Circuit recently explained:

2       In 8 U.S.C. § 1324, Congress created several discrete immigration offenses,
        including: (1) bringing an alien to the United States; (2) transporting or moving an
3       illegal alien within the United States; (3) harboring or concealing an illegal alien
        within the United States; and (4) encouraging or inducing an illegal alien to enter
4       the United States.

5   *United States v. Lopez*, 484 F.3d 1186, 1190-91 (9th Cir. 2007) (en banc).  Thus, "[t]ransporting

6   an undocumented alien solely within the United States 'constitutes a separate crime' from bringing

7   one 'to' the United States.  Congress' distinction between those two offenses and the punishments

8   that attach to each 'reflects the different dangers which the two crimes pose.'" *Id.* at 1196.

9           Indeed, in *Lopez*, the Ninth Circuit was faced with the specific question of when does the

10  offense of bringing an alien "to" the United States end.  There, the defendant was apprehended

11  within the United States after having just picked up, and while transporting, the undocumented

12  aliens.  *Id.* at 1188.  Lopez was charged with, and ultimately convicted of, transporting aliens

13  within the United States as well as aiding and abetting in bringing aliens to the United States.  *Id.*

14  The Ninth Circuit reversed the "brings to" convictions, holding that "the offense of bringing an

15  alien to the United States . . . ends when the person who transports the aliens to the country

16  terminates his act of transportation and drops off the aliens in the United States." *Id.* at 1191.  As

17  relevant to this case, the Ninth Circuit expressly rejected as a matter of law the government's

18  theory that a "brings to" offense that commences outside the United States does not terminate until

19  the aliens reach their "ultimate destination" in the United States.  *Id.* at 1191, 1194.

20          The Ninth Circuit's decision in *United States v. Hernandez-Orellana*, 539 F.3d 994 (9th

21  Cir. 2008), does not mandate a different conclusion.  It is true that the court there stated that

22  "*Lopez* is not controlling where an alien smuggling conspiracy has been charged." *Id.* at 1007.

23  But the court made this statement in the context of the sufficiency of evidence necessary to convict

24  a defendant of conspiracy versus a substantive crime.  *Lopez*, nonetheless, remains probative in

25  determining whether there is one or two substantive offenses present.  In this case, any

26  transportation of the aliens "to" the United States ended after they jumped the fence at the border

27  and long before they were picked up by Clevenger.  Applying *Lopez*, any offense of bringing

28

1  aliens to the United States ended at that time.[2]  Accordingly, treating this case as involving two

2  conspiracies is more consistent with *Lopez*.[3]

3  **II.    Participation in the conspiracy**

4  <u>A.    Conspiracy to transport aliens within the United States</u>

5  The Government has shown by a preponderance of the evidence that Clevenger and the

6  declarants were members of the conspiracy to transport aliens within the United States.  This

7  conspiracy is established by the discussions between the material witnesses and the smugglers *and*

8  *corroborated by* the fact that: (1) Clevenger's vehicle arrived at mile marker 42 just as El Guero

9  was running back, having previously left to make a call; and (2) Clevenger did transport the three

10 undocumented aliens in his vehicle.  *See Bourjaily*, 483 U.S. at 180-81.

11 <u>B.    Conspiracy to bring aliens to the United States</u>

12 On the other hand, the Government has provided no evidence to establish that Clevenger

13 _____

14 [2] The Court finds inapposite the two unpublished Ninth Circuit cases cited by the Government because they involved substantially more evidence of the defendants' participation in the alien smuggling.  *See United States v. Valle-Martinez*, 336 Fed. App'x 720, 723 (9th Cir. 2009) (not for

15 publication) (noting that the record contained "significant evidence of Valle-Martinez's involvement in the alien smuggling conspiracy); *United States v. Cedano*, 314 Fed. App'x 38 (9th Cir. 2008) (not

16 for publication) (emphasizing that there was evidence linking the defendant to the transported aliens).

17 [3] The Court also rejects the Government's reliance on *Griffin v. United States*, 502 U.S. 46, 56-57 (1991), and related cases.  Those cases concerned charging a single conspiracy that could be

18 committed by alternative *means* or was directed against separate *targets*.  *See, e.g.*, *Griffin*, 502 U.S. at 47-48, 56-57 (rejecting the defendant's challenge to her conviction for conspiracy to impair the

19 efforts of the Internal Revenue Service and to impair the efforts of the Drug Enforcement Administration ("DEA"), even though the evidence was insufficient to connect the defendant as to the

20 DEA object of the conspiracy); *Turner v. United States*, 396 U.S. 398, 402-03, 420 (1970) (sustaining the defendant's conviction under a one-count indictment charging him with knowingly purchasing,

21 possessing, dispensing, and distributing heroin in violation of 26 U.S.C. § 4704(a), even though there was sufficient evidence only of distribution).  They did not concern charging a single conspiracy for

22 two separate substantive *offenses*, as is the case here.  *See Lopez*, 484 F.3d at 1196 (""Transporting an undocumented alien solely within the United States 'constitutes a separate crime' from bringing

23 one 'to' the United States.  Congress's distinction between those two offenses and the punishments that attach to each 'reflects the different dangers which the two crimes pose.'").  The only case arguably

24 discussing a conspiracy charging separate offenses appears to be inapposite because it focused on whether a unanimity instruction as to the particular objects of the charged conspiracy was appropriate.

25 *See United States v. Castro*, 887 F.2d 988, 993-94 (9th Cir. 1989) (charging the defendant with a one-count conspiracy to defraud a bank by (1) misapplying the funds; (2) making false statements; and (3)

26 making false entries).  Moreover, the Ninth Circuit in *Castro* specifically noted that the evidence at trial "revealed only one conspiracy to defraud the Bank by committing the three offenses alleged" and

27 that "there was no discrepancy between the superseding indictment and the evidence." *Id.* at 993.  As discussed further below, that is not the case here because the indictment's focus is on two separate

28 substantive offenses and there is a discrepancy between the indictment and the evidence as to whether Clevenger had any participation in the smuggling conspiracy.

was part of the conspiracy to *bring* the aliens to the United States.  Looking at the statements made by the two material witnesses both after arrest and during their depositions, and giving the Government every benefit of the doubt, at most it can be said that: (1) there existed a conspiracy to smuggle the aliens into the United States; (2) it was pre-arranged that a red truck would pick them up at mile marker 42 on SR-94 and would transport them north; and (3) Clevenger suspected that the persons he was transporting just illegally entered the United States.  However, nowhere do the material witnesses indicate *anything* that would suggest that Clevenger was involved in the conspiracy to smuggle.  Indeed, even if the Court were to look to the indictment in this case, the overt acts alleged in the indictment provide no support for the Government's bare assertion that Clevenger was a participant in the conspiracy to bring the aliens to the United States:

- "On or about July 25, 2011, an unidentified co-conspirator told Diego Andres Cardenas-Alatorre, an illegal alien who had agreed to pay to be smuggled into the United States, that *after entering the United States* he would be picked up and transported by a red Ford Explorer."

- "On or about July 25, 2011, one or more uncharged co-conspirator(s) crossed into the United States from Mexico Diego Andres Cardenas-Alatorre and Jose Luis Hernandez-Victorino, two illegal aliens who had agreed to pay a fee to be smuggled into the United States."

- "On or about July 25, 2011, defendant DANIEL ARTHUR CLEVENGER drove a red Ford Explorer along Route 94 near Portero, California to *pick up* and *transport* Diego Andres Cardenas-Alatorre and Jose Luis Hernandez-Victorino."

- "On or about July 25, 2011, defendant DANIEL ARTHUR CLEVENGER *picked up* Diego Andres Cardenas-Alatorre and Jose Luis Hernandez-Victorino and *attempted to transport* them to another location within the United States."

(Indictment, at 2-3 [Doc. No. 13] (emphases added).)  Thus, at most, the only conclusion that can be drawn is that Clevenger was paid to, and did, transport the aliens *after* they entered the United States.  Mere *knowledge* that the aliens were just smuggled into the United States, however, is insufficient to establish the defendant's *participation* in the conspiracy to smuggle them.  *See United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996) ("[M]ere association with members of a conspiracy or knowledge of the conspiracy, 'without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator.'" (citation omitted)); *United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980) ("[T]here can be no conviction for guilt by association, and it is clear that mere association with members of a

1   conspiracy, the existence of an opportunity to join a conspiracy, or simple knowledge, approval of,

2   or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to

3   accomplish a specific illegal objective, is not sufficient to make one a conspirator."). At the very

4   least, the Government must demonstrate that "'the conspirators knew or had reason to know of the

5   scope of the conspiracy *and* that their own benefits depended on the success of the venture.'"

6   *Hernandez-Orellana*, 539 F.3d at 1007 (quoting *United States v. Sullivan*, 522 F.3d 967, 976 (9th

7   Cir. 2008)) (emphasis added). In this case, there has been no independent evidence presented so

8   far to establish that Clevenger knew or had reason to know of the scope of the "bringing in"

9   conspiracy *and* that his own benefits depended on the success of the venture. Accordingly, the

10  Government has failed to show by a preponderance of the evidence that Clevenger was a member

11  of the conspiracy to bring the aliens to the United States.

12  **III.    Made during the course of, and in furtherance of, the conspiracy**

13          Finally, regarding the conspiracy to transport the aliens within the United States, the

14  Government has shown by a preponderance of the evidence that the statements were made during

15  the course of, and in furtherance of, the conspiracy.

16          To be made "in furtherance of" the conspiracy, "a statement must advance a common

17  objective of the conspiracy or set in motion a transaction that is an integral part of the conspiracy."

18  *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993). "Although mere conversations or

19  narrative declarations between coconspirators are not in themselves sufficient to invoke the

20  exception to the hearsay rule, statements made to keep coconspirators abreast of an ongoing

21  conspiracy's activities satisfy the 'in furtherance of' requirement." *Id.* Moreover, it is not

22  necessary that the statements be made to another member of the conspiracy. *Id.*

23          In this case, the statements that the Government seeks to admit refer to how the aliens were

24  going to be transported within the United States. Specifically, the smugglers described: (1) the

25  vehicle that was to pick the aliens up; (2) the location at which it was to pick them up; and (3) that

26  the vehicle was to take them to another location in the United States. These statements are clearly

27  "in furtherance of" the conspiracy to transport the aliens within the United States because they

28  "advance a common objective of the conspiracy"—the transportation of the aliens. *See Williams*,

989 F.2d at 1068.  Moreover, the statements were also made "during the course" of the conspiracy because they all relate to the time before Clevenger picked up the aliens at the side of the road. The fact that some of the statements might have been made before Clevenger joined the conspiracy is irrelevant because statements of co-conspirators are admissible regardless of when the defendant personally joins the conspiracy.  *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393 (1948); *United States v. Anderson*, 532 F.2d 1218, 1230 (9th Cir. 1976).

CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** the Government's motion to admit statements about smuggling arrangements.

First, to the extent the Government seeks to admit statements relating to the conspiracy to *bring* aliens to the United States, the Government has not demonstrated by a preponderance of the evidence that Clevenger was a participant in that conspiracy.  Accordingly, the Court **DENIES** the motion to admit any statements relating to the conspiracy to bring aliens to the United States.

Second, to the extent the Government seeks to admit statements relating to the conspiracy to *transport* aliens within the United States, the Court **GRANTS** the Government's motion to admit the statements relating to that conspiracy.

**IT IS SO ORDERED.**

Date:  **December 1, 2011**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

11cr3518–IEG